Filed 5/30/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BAC TIENG NGUYEN,<br><br>    Defendant and Appellant. | G052484<br><br>(Super. Ct. No. 14WF0032)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham, Judge. Affirmed.

Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan J. Beale and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Bac Tieng Nguyen appeals following his conviction for aggravated assault on a police officer (Pen. Code, § 245, subd. (c)) based on a situation in which he wielded a large knife and took a step toward police officers after the officers ordered him to put the knife down.[1] He argues that the "present ability" element of the crime was missing, as a matter of law, given the 10- to 15-foot distance between him and the officers at the time of the incident. He also requests that we independently review the documents reviewed in camera by the trial court in conjunction with a *Pitchess*[2] motion he filed, which sought to obtain information from confidential police officer personnel records. Our independent review reveals no error, and, thus, we affirm the judgment.

I

FACTS

On January 5, 2014, defendant's father called 9-1-1 to report that there was a man at his house who was making threats while carrying a large knife or samurai sword. Garden Grove Police Officers John Raney and Joshua Olivo responded to the scene, and learned upon their arrival that the sword-wielding man was defendant. Defendant's father, who was standing in the front yard when the officers arrived, appeared stressed and nervous. He told the officers that defendant was inside the house and was "loco."

Officers Raney and Olivo approached the wide-open front door of the residence and stopped a couple of feet away from the threshold. Defendant came around a corner inside the house and stood approximately 10 to 15 feet away from the officers, in the area located straight inside the front door. Because defendant was facing in such a way that the officers could only see his right side, Officer Olivo told defendant to show both his hands "or [he was] going to shoot [defendant]." Defendant lifted his left hand to

---

[1] All further statutory references are to the Penal Code.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

2

reveal a knife that he was carrying which was about 12 to 15 inches in length. He raised the knife to his throat and said to the officers, "shoot me." Upon seeing the knife, Officer Olivo removed his gun from its holster.

Officers Raney and Olivo unsuccessfully attempted to get defendant to drop the knife and walk towards them. Instead, defendant moved the knife away from his neck, pointed it in the direction of the officers and took a step toward them. Fearing for Officer Raney's and his own safety, Officer Olivo unholstered his gun and fired three rounds toward defendant, hitting him and causing him to fall to the floor. The officers approached defendant, handcuffed him and rendered first aid to him while awaiting the paramedics.

Defendant was charged with one felony count of aggravated assault on a peace officer (§ 245, subd. (c)), and one misdemeanor count of brandishing a deadly weapon (§ 417, subd. (a)(1)). The information was later amended to eliminate the second count and replace it with one felony count of resisting an executive officer (§ 69).

Prior to trial, defendant filed two *Pitchess* motions, seeking discovery of certain records from Officer Raney's and Officer Olivo's personnel files. The motions sought information relating to the officers' credibility and honesty, past acts involving moral turpitude or use of excessive force, and any discipline imposed on the officers in relation to the incident involving defendant. The trial court found it appropriate to do an in camera review of the documents potentially responsive to each motion in order to determine if any were discoverable, in full or in part. Based on its in camera reviews, the court concluded there was nothing to disclose.

A jury convicted defendant of the two counts charged, and the trial court sentenced him to three years in prison. Defendant timely appealed.

3

## II

## DISCUSSION

Defendant raises two issues on appeal, one concerning his pretrial *Pitchess* motions and the other concerning the jury's verdict. With respect to the former, he asks that we independently review the documents the trial court reviewed in camera in conjunction with his *Pitchess* motions to determine whether the court erred in finding that there were no discoverable documents or portions of documents. As for the latter, he argues that, as a matter of law, he could not be found guilty of aggravated assault on a peace officer because he "did not have the 'present ability' to strike the officer[s] with [the] knife" due to how far away from them he was standing. We find no merit to either of defendant's contentions.

Our review of the trial court's *Pitchess* motion determination is for an abuse of discretion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228 (*Mooc*).) In *Mooc*, the Supreme Court held that in order to preserve the defendant's ability to obtain appellate review of the denial of a *Pitchess* motion, the trial court should make a record of the documents it reviewed in camera, either by photocopying the documents, preparing a written list of the documents it reviewed and/or stating on the record the documents it reviewed. (*Id*. at p. 1229.) Discoverable information generally includes limited information from a peace officer's confidential personnel records that is potentially relevant to the defense's case — either a proposed defense or the impeachment of an officer. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021-1022.)

We have independently reviewed the sealed reporter's transcript of the in camera proceedings, as well as the sealed unredacted version of defendant's motions. During the in camera proceeding, the trial court reviewed the personnel files of Officers Raney and Olivo that were provided by the custodian of records, and described the documents reviewed. (*Mooc, supra*, 26 Cal.4th at p. 1226.) We are satisfied that the

4

court did not abuse its discretion by finding there was no information to disclose. (*People v. Byers* (2016) 6 Cal.App.5th 856, 869.)

Turning to defendant's next contention, he argues that a person with a knife who is standing 10 to 15 feet away from a police officer — as in defendant's case — may never be convicted of aggravated assault because the person will never, as a matter of law, have the requisite "'present ability' to commit a battery." As framed, this is a question of law that we review de novo. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 316, fn. 3.)

To establish a violation of section 245, subdivision (c), among the elements that must be proven are those of assault.[3] This includes demonstrating that the defendant had the "present ability . . . to commit a violent injury." (§ 240; *People v. Chance* (2008) 44 Cal.4th 1164, 1167 (*Chance*).) To have a "present ability," there must be threat of "'a present, and not a future injury.'" (*Id*. at p. 1171.) However, immediacy is not required. (*Id*. at pp. 1168, 1173, fn.11.) "[W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required . . . if he is capable of inflicting injury on the given occasion, *even if some steps remain to be taken*, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Id.* at p. 1172, italics added; see, e.g., *People v. Ranson* (1974) 40 Cal.App.3d 317 [conviction of assault affirmed based on aiming of rifle at police car even though defendant would have needed to clear a magazine jam and chamber a round before being able to fire].)

---

[3] Section 245, subdivision (c), provides: "Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years."

Defendant acknowledges the "many cases" which have concluded that being "'several steps away' from actually inflicting injury" does not preclude a finding of present ability, but he attempts to limit the application of that conclusion to scenarios involving a loaded gun. There is no such limitation. The interpretation of law issue involved in *Chance* concerned the meaning of the phrase "present ability" as applied to assaults, generally, not as to any particular weapon. (*Chance*, *supra*, 44 Cal.4th at pp. 1167, 1169.) And, although the factual situation presented in *Chance* involved a loaded gun, the Supreme Court cited with approval cases discussing other weapons, such as swords and hatchets. (*Id*. at pp. 1172, 1174, citing *People v. McMakin* (1857) 8 Cal. 547, 548 [swords and bayonets]; *People v. Yslas* (1865) 27 Cal. 630, 631, 633-634 (*Yslas*) [hatchet].)

Yslas is a prime example. "In *Yslas*, the defendant approached within seven or eight feet of the victim with a raised hatchet, but the victim escaped injury by running to the next room and locking the door. Yslas committed assault, even though he never closed the distance between himself and the victim, or swung the hatchet." (*Chance*, *supra*, 44 Cal.4th at p. 1174, citing *Yslas*, *supra*, 27 Cal. at pp. 631, 633-634.) We decline to distinguish, as a matter of law, a situation involving seven or eight feet of separation between the perpetrator and the victim, from that involving 10 or 15 feet, as in the present case. Such is a factual matter within the province of the trier of fact. (*People v. Williams* (2001) 26 Cal.4th 779, 790 [trier of fact in assault case is charged with determining whether defendant's "act by its nature will probably and directly result in the application of physical force against another"].)

6

III

DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

BEDSWORTH, Acting P.J., Concurring:

I have signed the majority opinion under the compulsion of *People v. Myles* (2012) 53 Cal.4th 1181, *People v. Mooc* (2001) 26 Cal.4th 1216, 1229, and *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450. As presently expressed, California law seems to provide appellate review not of the *merits* of an in camera *Pitchess* hearing (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531), but only of the *procedures* followed. We have reviewed those procedures in this case and they are unobjectionable, so the majority opinion is correct.

But I don't think it's right. I cannot understand why this one area of criminal law provides for no meaningful review of the trial court's decision *on the merits*. It is beyond my ken that we provide appellate review of every other trial court decision, but choose not to provide it on this important issue of criminal discovery.

*People v. Myles, supra,* 53 Cal.4th at p. 1209, says, "The sealed transcript that is before us, in which the court 'state[d] for the record what documents it examined,' is adequate for purposes of conducting a meaningful appellate review." Under that interpretation of applicable precedent, the trial court does exactly what it did here: opens the file, recites its contents, tells us it finds nothing discoverable, and denies disclosure. We then receive a transcript that tells us "what documents [the court] examined." I am unable to understand how we can provide meaningful review under those circumstances.

There is simply no way to evaluate the trial court's decision on such a record. There could well be a complaint or a report we would consider discoverable. There could well be a dozen. We simply have no way of knowing. If we do not have copies of the documents in question, we cannot say whether the trial court has correctly assessed their import.

1

And I am unable to apperceive why providing copies of those documents presents a problem. It seems to me the trial court could easily order copies made of the documents it has reviewed and seal them. We could then review those copies and determine whether the trial court correctly exercised its discretion.

I don't mean to suggest in any way that I distrust the trial court's review in this case – or in cases in general. I spend a great deal of my time marveling at the ability of our trial bench to make a correct call in five minutes on issues I struggle with for five days. But recognizing the competence and bona fides of our trial bench and giving them broad discretion is a far cry from instituting a system in which they are the last word on a question. And since I don't find such final authority in other areas of the law, I question its wisdom here.

But I am at a loss to interpret *Mooc* and *Myles* in any other way. *People v. Mooc*, the foundation of the *Myles* language to which I take exception, was a case in which the appellate court, frustrated by its inability to conduct a meaningful *Pitchess* review without the documents in question, ordered the entirety of the officer's personnel files provided. The Supreme Court correctly noted that order did not cure the problem because the trial court had not indicated what files it reviewed, so there was no way to know what documents in the complete file had been before it during its *Pitchess* hearing. But, since it now had the officer's entire personnel file before it, it reviewed the file and ruled on the motion itself, rather than delay the case any further.

In doing so, the court recognized the availability of a procedure whereby the trial court "can photocopy [the documents it reviewed] and place them in a confidential file," (*People v. Mooc, supra,* 26 Cal.4th at p. 1229) but went on to say, "Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what documents it examined." (*Ibid.*) That is what the trial court did in this case, so I must sign the opinion.

2

Usually, when I come up against a result I find inexplicable, I go back over my work looking for the mistake that led me to that result. Usually I find it. But I can't find it here. There are cases I can distinguish. In *People v. Prince* (2007) 40 Cal.4th 1179, 1285-1286, for example, the court approved the procedure here, but did so in a case in which the record included "a full transcript of both segments of the in camera hearing and the documents that formed the basis for the court's conclusion that defendant was not entitled to the complaints that had been filed against [the officer]." (*Ibid.*) And I can find cases where the issue was considered only in passing, or in which the rule was stated without discussion. But I cannot find anything on which I could hang a dissent.

I can only do what I do here: Articulate my concern that our review of in camera *Pitchess* hearings does not go far enough, urge trial courts to include copies of the documents reviewed, as suggested in *Mooc*, and express my hope the Supreme Court will either correct our misunderstanding of the state of the law or reconsider its position.


BEDSWORTH, ACTING P. J.

WE CONCUR:



MOORE, J.



FYBEL, J.


3