Filed 12/14/2016

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051068 |
| v. | (Super. Ct. No. 13NF0535) |
| DAVID SHEA BYERS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Kimberly Menninger, Judge. Affirmed.

Daniel R. McCarthy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

The court denied defendant David S. Byers's motion to suppress evidence. (Pen. Code, § 1538.5.)[1] Defendant then pleaded guilty to possession of cocaine for sale (Health & Saf. Code, § 11351; count 1) and misdemeanor possession of nitrous oxide for the purpose of intoxication (§ 381b; count 2). The court imposed the upper term of four years on count 1, stayed sentence on count 2 under section 654, and then designated a split sentence of one year in jail followed by three years of mandatory supervision under section 1170, subdivision (h)(5).

On appeal, defendant contends law enforcement's warrantless entry into his apartment pursuant to his absent housemate's consent violated the Fourth Amendment. First, he argues his housemate's consent (given while handcuffed and in custody) was coerced. Second, he argues the court abused its discretion by excluding evidence on whether the officers violated the knock-and-announce rule, which requires police to knock, announce their presence, and wait a reasonable time before entering a dwelling, absent exigent circumstances. (§ 1531; see *People v. Abdon* (1972) 30 Cal.App.3d 972, 976-977.) Third, citing *Georgia v. Randolph* (2006) 547 U.S. 103, 114 (*Randolph*), defendant argues the exclusionary rule is the proper remedy here because the officers' alleged violation of the knock-notice requirement left him insufficient time to reach the door to deny them entry.

Related to these arguments, defendant requests us to independently review the sealed transcript of the court's in camera hearing held pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), as well as the documents reviewed by the court in that hearing.

We conclude substantial evidence supports the court's finding defendant's housemate's consent was voluntary. But we hold the court abused its discretion by excluding evidence on whether the officers complied with the knock-notice requirement.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

Nevertheless, the error was harmless because the appropriate remedy for a knock-notice violation here was *not* the suppression of the seized evidence, which was the only relief requested in defendant's section 1538.5 motion. We also conclude there was no *Pitchess* error.

FACTS

*The People's Case at the Suppression Hearing*

Around 5:30 p.m., on February 8, 2013, Officer Pedram Gharah and three other officers conducted surveillance of an apartment based on information that a man might be selling drugs there. At the time, the officers did not have a warrant.

Gharah observed a man leave the apartment. Gharah and the other officers learned from a records check and the apartment manager that the man was Brandon Wallace, who had a warrant for his arrest for driving under the influence.

About 10 to 15 minutes later, Wallace returned in a vehicle driven by another man. The two men parked in the apartment complex's parking lot and got out of the vehicle.

In the same parking lot, one of the surveillance officers was getting dressed in a raid vest. Believing his vest had been seen, the officer asked Wallace to identify himself. When Wallace stated his name, the officer removed his gun from its holster, pointed it down in a "low ready" position, and commanded Wallace and his companion to get on the ground. Gharah returned from the manager's office and assisted in handcuffing Wallace and the other man.[2]

Wallace was placed in the back seat of an undercover van. He told Gharah he lived in the subject apartment and that the southwest bedroom was his own room. He

---

[2] At some point, Gharah obtained a key to the apartment from the manager's office.

3

admitted having narcotics and a gun in his bedroom. He told Gharah the police could search his bedroom and retrieve those items. No threats or promises were made to obtain Wallace's consent.

Wallace said his roommate might be home. Gharah knew that the roommate was defendant.

Gharah and two other officers went to the apartment. Gharah could hear people inside. He knocked on the door and announced, "Police Department."[3] Upon entering the apartment, he saw two men about three feet away walking toward the door. Defendant was seated at the kitchen table. On the table was a box of sandwich baggies, a digital scale, and a white powdery substance.

Defendant refused to consent to a search of his bedroom. He told the police to get a warrant. The officers discovered defendant's girlfriend in his bedroom while conducting a protective sweep of the apartment for officer safety.

Based on the items in plain view on the kitchen table, the officers then obtained a warrant to search defendant's bedroom and the rest of the apartment.

*Defense Case*

Wallace testified on direct examination that he was placed in handcuffs on the ground and moved to an unmarked van where about six plainclothes officers were present. He testified that when the officers asked for his consent to search the apartment, he "did not give them permission to enter the premises."

On cross-examination, however, Wallace admitted there was a criminal case pending against him stemming from the contraband found in his bedroom during the search. Wallace characterized the drugs found in his bedroom as "research chemicals"

---

[3]    Defense counsel asked Gharah whether, after he knocked, he waited for a response from the people in the apartment. The prosecutor objected for lack of relevance, and the court sustained the objection.

that were purchased legally on the internet. The cocaine and other drugs were in his bedroom "just to have them" so that when he wanted to take them he did not have to find them. The gun was there "just for show, just to have it." He had received the gun as a "gift." He had told the police about the drugs and the gun in his bedroom and had given them permission to search his room, but only if his roommate gave them consent to enter the house to get to Wallace's room.

*The Court's Ruling*

The court denied defendant's suppression motion, stating the law was settled "that a consent-based search is valid when consent is given by one person with common . . . authority over the area to be searched." The court found Gharah was a credible witness, whereas Wallace was *not* credible. Particularly unbelievable, in the court's view, was Wallace's testimony he told the police they could search his room only if they first obtained defendant's consent to enter the apartment. The court concluded that Wallace gave Gharah valid consent to search his room. The court continued, "Once it's a valid consent the officer had the absolute right to walk into the house at that point, and go directly to the room of Mr. Wallace." The court stated that once Gharah walked to the threshold of the door, he could see defendant's drugs, which gave him probable cause to get a warrant and to freeze and hold the property until the warrant was obtained, which is what Gharah did.

DISCUSSION

*General Legal Principles*

"The Fourth Amendment to the Constitution protects '[t]he right of the people to be secure in their . . . houses . . . against *unreasonable* searches and seizures.'" (*Wilson v. Arkansas* (1995) 514 U.S. 927, 931 (*Wilson*), italics added.) A search without

5

a warrant is unreasonable per se unless it falls within an established exception. (*People v. Woods* (1999) 21 Cal.4th 668, 674.)

One exception to the requirement of a warrant is a search conducted pursuant to consent. (*People v. Woods*, *supra*, 21 Cal.4th at p. 674.) Specifically, a warrantless entry into a dwelling is reasonable under the Fourth Amendment if a person possessing authority voluntarily consents to the search of the property. (*Randolph*, *supra*, 547 U.S. at p. 109.) The consenting person might be the occupant against whom evidence is sought. (*Ibid.*) Or, if the suspect is absent, the consent-giver might be a co-occupant who shares common authority over the property. (*Ibid.*) However, when an occupant consents to a search, but a co-occupant who "is present at the scene . . . expressly refuses to consent," the co-occupant's refusal "prevails, rendering the warrantless search unreasonable and invalid as to" him. (*Id.* at p. 106.) This is because one occupant's consent is not "good against another [occupant], standing at the door and expressly refusing consent." (*Id.* at p. 119.)

When the police obtain consent from a co-occupant who is *off* the premises, they must comply with the knock-and- announce rule. (*Duke v. Superior Court* (1969) 1 Cal.3d 314, 321-322 (*Duke*) [statutory knock-notice]; *People v. De La Plane* (1979) 88 Cal.App.3d 223, 234-235 (*De La Plane*) [statutory knock-notice], disapproved on another point in *People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25; 4 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Illegally Obtained Evidence, § 345, p. 1207 ["knock-notice rule"].)[4] This rule requires the police to knock on the door, announce their identity and

---

[4] *Duke* and *De La Plane* predate *Wilson*, *supra*, 514 U.S. 927, which added the knock-notice requirement as a factor to be considered in the Fourth Amendment's reasonableness inquiry. Prior to *Wilson*, the knock-notice requirement was entirely statutory. (*Wilson*, at p. 936; §§ 1531 [executing warrant], 844 [making arrest].) In another pre-*Wilson* case, our Supreme Court held that, because section 844 "states the conditions which the police must comply with before making a forced entry," it does not apply when persons present inside the residence consent to the officers' entry. (*Mann v. Superior Court* (1970) 3 Cal.3d 1, 9.)

purpose, and wait a reasonable period of time before attempting to forcibly enter. (*Richards v. Wisconsin* (1997) 520 U.S. 385, 387-388 (*Richards*); *United States v. Banks* (2003) 540 U.S. 31, 35 (*Banks*).)

Certain exceptions, however, allow the police to dispense with the knock-notice requirement. A "no-knock" entry is justified if the officer reasonably suspects that complying with the rule would be dangerous or futile, or would allow the destruction of evidence. (*Richards*, *supra*, 520 U.S. at p. 394.) The showing required to meet this standard is *not* high. (*Ibid.*) The reasonableness of a "no-knock" entry must be determined by trial courts (*Wilson*, *supra*, 514 U.S. at p. 936) on a case-by-case basis depending on "the facts and circumstances of the particular entry" (*Richards*, at p. 394).

Whether officers complied with the knock-notice requirement is one factor in determining whether a search was reasonable under the Fourth Amendment. (*Wilson*, *supra*, 514 U.S. at p. 936.) In this context, the Fourth Amendment's reasonableness requirement is flexible (*Wilson*, at p. 934) and bright-line rules are eschewed (*Banks*, *supra*, 540 U.S. at p. 36).

The knock-notice requirement "is not easily applied." (*Hudson v. Michigan* (2006) 547 U.S. 586, 589 (*Hudson*).) "[I]t is not easy to determine precisely what officers must do. How many seconds' wait are too few? Our 'reasonable wait time' standard [citation], is necessarily vague." (*Id.* at p. 590.) "[W]hat constituted a 'reasonable wait time' in a particular case, [citation] (or, for that matter, how many seconds the police in fact waited), or whether there was 'reasonable suspicion' of the sort that would invoke the *Richards* exceptions, is difficult for the trial court to determine and even more difficult for an appellate court to review." (*Hudson*, at p. 595.)

In *Hudson*, the Supreme Court held that the exclusionary rule is *not* the appropriate remedy for a violation of the knock-notice requirement.[5] (*Hudson*, *supra*,

_____

[5] In *Hudson*, Justice Kennedy joined Parts I through III (but not Part IV) of Justice Scalia's plurality opinion (*Hudson*, *supra*, 547 U.S. at p. 604 [J. Kennedy conc.

7

547 U.S. at pp. 590, 599.) In part, this is because the exclusionary rule and the knock-notice requirement serve different purposes. The exclusionary rule protects against unlawful warrantless searches. (*Id.* at p. 593.) The knock-notice requirement, in contrast, seeks to prevent violence (due to an inhabitant being taken by surprise), property destruction (e.g., of a door), and loss of an occupant's privacy and dignity (caused by an outsider's sudden entry). (*Id.* at p. 594.) When officers have a search warrant, the knock-notice requirement is *not* intended to prevent "the government from seeing or taking evidence described in [the] warrant." (*Ibid.*) Similarly, when a search is conducted pursuant to an absent co-tenant's consent, the purposes of the knock-notice requirement (*Duke*, *supra*, 1 Cal.3d at p. 321) do *not* include preventing law enforcement from seeing or seizing evidence pursuant to the consent exception. Furthermore, the exclusionary rule is applicable only "'where its deterrence benefits outweigh its "substantial societal costs . . . ."'" (*Hudson,* at p. 591.) The costs of recognizing the exclusionary rule as a remedy for knock-notice violations would include the release of dangerous criminals into society, inordinate wait times before entry and consequent destruction of evidence, and a "constant flood of" litigation about hard-to-apply standards such as what is "a 'reasonable wait time'" or whether officers had a "'reasonable suspicion.'" (*Id.* at p. 595.) These substantial societal costs outweigh the knock-notice requirement's minimal deterrence value (*id*. at p. 596), especially because an officer's violation of the rule is deterred by the risk of civil suit and/or internal police discipline (*id*. at pp. 597-599).

---

opn.]), thus concurring in the judgment on the narrowest grounds (*Marks v. U.S.* (1977) 430 U.S. 188, 193). Accordingly, we discuss only Parts I through III of Justice Scalia's opinion.

8

*Substantial Evidence Supports the Court's Finding Wallace's Consent was Voluntary*

Defendant contends Wallace's consent was coerced. He points out that, before Wallace was asked to consent to a search of his bedroom, he was detained outside the apartment, ordered to the ground by an officer with a drawn gun, arrested, handcuffed, placed in the back of a van, and surrounded by several officers.

Whether Wallace voluntarily consented is a question of fact to be determined in the light of all the circumstances. (*People v. Llamas* (1991) 235 Cal.App.3d 441, 447.) We apply the substantial evidence standard of review to the court's finding Wallace's consent was voluntary. (*Ibid.*)

A "person's in-custody status, even when he is handcuffed, does not automatically vitiate his consent; this is '"but one of the factors, but not the only one, to be considered by the trial judge who sees and hears the witnesses and is best able to pass upon the matter."'" (*People v. Llamas*, *supra*, 235 Cal.App.3d at p. 447.) For example, in *Llamas*, the co-occupant was illegally detained, arrested, handcuffed, and placed in the back of a patrol car with other units present at the scene. (*Ibid.*) The appellate court held these facts did not rise to the level of coercion. (*Ibid.*)

Here, the court found Gharah was a credible witness and Wallace was not. Gharah testified that Wallace admitted having drugs and a gun in his bedroom and that he consented to Gharah's searching the bedroom and retrieving those items. No threats or promises were made to obtain Wallace's consent. This substantial evidence supports the court's finding Wallace's consent was voluntary.

*The Court Abused Its Discretion by Excluding Testimony on Whether the Officers Waited Long Enough to Comply with the Knock-notice Requirement*

Defendant contends the court abused its discretion by refusing to admit relevant evidence on the officers' method of entry into his apartment. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639-640 [court's

9

exclusion of evidence reviewed for abuse of discretion].)  He argues that, "if this court believes [the] facts are insufficient to establish a knock-and-announce violation, the court should order a new suppression hearing to fill in the gaps in testimony."

The Attorney General counters the "record demonstrates substantial compliance with the knock-notice procedure" and that, even if the court's evidentiary "ruling was erroneous, it was harmless under any standard."

At the suppression hearing, defense counsel attempted to cross-examine Gharah on whether, after he knocked on the door, he waited for a response from the people in the apartment.  The prosecutor objected on relevance grounds and the court sustained the objection.  Two questions later, defense counsel asked Gharah where the officers' weapons were at the time of entry, and the court again sustained the prosecutor's relevance objection.  The court explained that federal cases allow a dwelling to be searched if consent is given by another resident, citing *Randolph*, *supra*, 547 U.S. 103. Defense counsel argued that under *Randolph*, such consent is invalid if a co-tenant objects to the officers' entry.  The court disagreed:  "[T]he joint area is still accessible to get to the bedroom. . . .  [A]s long as one [tenant] allows entry into the house . . . the officer may go in."  The officers "can't go into the bedroom of the tenant who objects but they can certainly go into the shared areas at all times . . . ."

Later in the hearing, defense counsel made an offer of proof requesting that another of the surveillance officers be called to testify about the manner of entry into the apartment.  According to defense counsel, the officer had a digital recording device "which shows the manner of entry and . . . a knock on the door and then the officers immediately shouting for everyone to get on the ground."

The court stated that whether the officers had a key to the apartment made no difference because the "real issue is whether or not legally the roommate can give permission to have police officers enter into a house."  The court continued:  "[I]t doesn't really matter how they opened the door."  "[T]hey could crowbar it if he wanted

10

to get into his own house . . . ." Once inside the house, the police, for purposes of officer safety, could "secure everyone" and "go forward and secure the gun" in Wallace's bedroom. The drugs were in plain view. "[I]t's a pretty straightforward case . . . from the court's perspective."

On appeal, both parties acknowledge the officers in this case were subject to the knock-notice requirement. Indeed, cases hold that consent by an *absent* occupant does *not* excuse compliance with section 844 (which requires a peace officer to demand admittance and explain his or her purpose before breaking open a house's door or window to effectuate an arrest). (*Duke*, *supra*, 1 Cal.3d at p. 317; *De La Plane*, *supra*, 88 Cal.App.3d at p. 235.)

Thus, the court erred by foreclosing defense counsel's cross-examination on how long the officers waited before opening the door. The evidence was relevant because a search pursuant to an absent co-occupant's consent is subject to the requirement's knock, announce, and wait requirements. Nonetheless, for the reasons discussed below, the error was harmless under any standard.

*The Error was Harmless Because Even if a Knock-notice Violation Occurred, It Would Not Have Resulted in Suppression of Evidence (the Only Remedy Requested by Defendant)*

Defendant contends the seized evidence must be excluded because the police entered "his apartment immediately after announcing their presence," thereby giving him no time "to respond when they knocked on his door [and] depriving him of his right to withhold consent to the search, which he would not have given." He acknowledges that, in "most cases, a knock-and-announce violation does not require the application of the exclusionary rule because there is little or no causal connection between the violation of the [knock-and-announce] rule and the evidence seized," citing *Hudson*, *supra*, 547 U.S. at page 594. But he argues the *Hudson* rule does not apply here: "In this case, however, the violation of the [knock-and-announce] rule led directly to the

11

seizure of evidence.  This is because, if the police had allowed time for [defendant] to respond before entering, he would have asserted his right to deny his consent to the search, and the officers would have been barred from entering."  For this proposition, he cites *Randolph*, *supra*, 547 U.S. at page 114.

Defendant's argument is founded on at least one misapprehension. Contrary to his apparent assumption, in a drug case like this one, the officers need not wait long enough for "the resident to reach the door."  (*Hudson*, *supra*, 547 U.S. at p. 590.)  Rather, the proper measure of a reasonable wait time in a drug case is "how long it would take to dispose of the suspected drugs."  (*Ibid.*)  As explained in *Banks*:  "[W]hat matters is the opportunity to get rid of cocaine, which a prudent dealer will keep near a commode or kitchen sink.  The significant circumstances include the arrival of the police during the day, when anyone inside would probably have been up and around, and the sufficiency of 15 to 20 seconds for getting to the bathroom or the kitchen to start flushing cocaine down the drain.  That is, when circumstances are exigent because a pusher may be near the point of putting his drugs beyond reach, it is imminent disposal, not travel time to the entrance, that governs when the police may reasonably enter; since the bathroom and kitchen are usually in the interior of a dwelling, not the front hall, there is no reason generally to peg the travel time to the location of the door . . . ."  (*Banks*, *supra*, 540 U.S. at pp. 39-40.)

*Randolph*, too, is problematic for defendant's argument:  Gharah and the other officers were authorized by Wallace's consent to enter the apartment, unless defendant refused them entry *at the door*.  (*Randolph*, *supra*, 547 U.S. at pp. 121-122.) Indeed, defendant acknowledges that *Randolph's* holding does not render a search unreasonable if "the defendant [is] nearby but [does] not have the opportunity to object." In *Randolph*, the Supreme Court confirmed the continuing validity of *United States v. Matlock* (1974) 415 U.S. 164, 170 and *Illinois v. Rodriguez* (1990) 497 U.S. 177, 186, which upheld the validity of searches made pursuant to an occupant's consent when no

12

*present* co-occupant objected, even though a co-occupant was *nearby*: "Although the *Matlock* defendant was not present with the opportunity to object, he was in a squad car not far away; the *Rodriguez* defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant. If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact *at the door* and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." (*Randolph,* at p. 121, italics added.) *Randolph* continued: "This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it." (*Id.* at pp. 121-122.) "[I]t would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received. . . . [E]very co-tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential objector. Better to accept the formalism of distinguishing *Matlock* from this case than to impose a requirement, time consuming in the field and in the courtroom, with no apparent systemic justification." (*Id.* at p. 122.)

Thus, *Randolph* drew a fine, but bright line: In order to countermand an occupant's consent to a search, the objecting co-occupant must be present at the door (or, we assume, at the point of entry for the search) to express his refusal. *Hudson* laid down a clear rule that the remedy for knock-notice violations is *not* the suppression of seized

13

evidence.  These bright-line rules aim to forestall inordinate litigation and impediments to societally beneficial police work.

Yet, defendant seems to argue that, in his case, *Randolph* carves out an exception to *Hudson's* denial of the exclusionary rule as a remedy for knock-notice violations.  Because Wallace was absent and the officers were therefore required to knock, announce, and wait before entering, defendant argues he would have stopped the officers at the door *but for* their alleged violation of the knock-notice requirement.  But this causation argument is speculative.  It presupposes defendant could have reached the door within the time the officers were reasonably required to wait.  It presupposes he could have made it to the door before the police opened it enough to see the contraband.  It presupposes the *Richards* exigency exception for the imminent destruction of evidence did not apply.  The validity of his assumptions depends on how a fact finder might answer various questions.  What is a reasonable estimate of how long it would take a person inside the apartment to start flushing easily disposable cocaine powder down the drain?  Did the police reasonably believe defendant possessed powder cocaine?  How long did the officers actually wait?  How long would it take a person to react to the knock, get up from the kitchen table, and run to the front door of the apartment?  Would the person be hindered by the two men already walking toward the door?  And — in a question essential to defendant's causation theory — would he (not knowing whether the police had a warrant) have actually rushed toward the front door at the sound of the knock, or would he have raced to the kitchen sink to flush away the cocaine?  The end result of defendant's speculative theory is more litigation and more uncertainty for officers standing at the door.

We decline to embark on this road to speculation.  Instead, we take the Supreme Court at its word:  The lines it drew in *Hudson* and *Randolph* are firm.  *Hudson* was explicit:  It was *not* tackling the intricacies of how to apply the knock-notice requirement.  (*Hudson*, *supra*, 547 U.S. at p. 590.)  Rather, it was spelling out a clear

14

limitation on the "remedy." (*Ibid.*) *Hudson* explained the reasons why the exclusionary rule is an "unjustified" remedy for knock-notice violations. (*Id.* at p. 599.) First, the societal costs of the exclusionary rule are high. (*Id.* at p. 591.) Balanced against these costs is the existence of other deterrents which dissuade officers from violating the knock-notice requirement, such as the threat of civil suits or internal police discipline. (*Id.* at p. 594.) The purposes of the knock-notice requirement do *not* include "preventing the government from seeing or taking evidence described in a warrant." (*Ibid.*) By the same logic, the requirement's purposes do *not* include keeping the government from seizing evidence found pursuant to a co-tenant's valid (and unopposed) consent to entry. As *Randolph* explained, the unlucky "potential objector, nearby but not invited to take part in the threshold colloquy, loses out." (*Randolph*, *supra*, 547 U.S. at p. 121.)

In sum, the court's evidentiary error was harmless since the remedy for a knock-notice violation does not include suppression of evidence, which is the only remedy defendant requested in his suppression motion.

*The Court Did Not Abuse its Discretion by Finding no Discoverable Material in the* Pitchess *Hearing*

Pursuant to defendant's request, we have independently reviewed the sealed reporter's transcript of the in-camera hearing held by the trial court after it granted defendant's motion, filed pursuant to *Pitchess*, *supra*, 11 Cal.3d 531, seeking discovery of the personnel files of Gharah and two other officers involved in the arrest of Wallace and the search of defendant's apartment, as such files related to (1) lack of credibility, falsifying police reports, or material omissions; (2) prior acts involving moral turpitude within the meaning of *People v. Wheeler* (1992) 4 Cal.4th 284; and (3) whether the officers were previously employed by a different law enforcement agency. We do not have copies of the documents the court reviewed. However, under the procedures outlined by our Supreme Court in *People v. Mooc* (2001) 26 Cal.4th 1216, the trial court

15

may "state for the record what documents it examined." (*Id*. at p. 1229.)  Pursuant to this procedure, the court described on the record the general nature of 56 documents submitted by the custodian of records, and further described the content of two documents the custodian of records had identified as "potentially relevant."  (*Ibid*.)  We are satisfied the trial court did not abuse its discretion by finding no discoverable information.  (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039 [trial court's ruling on motion for discovery of peace officer personnel records is reviewed for abuse of discretion].)

DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

FYBEL, J.