Filed 2/14/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHNNY LEE GUYTON, JR.,<br><br>    Defendant and Appellant. | G053662<br><br>(Super. Ct. No. 15NF1059)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge. Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Jennifer B. Troung, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury found defendant Johnny Lee Guyton, Jr., guilty of human trafficking, pandering, and pimping of an adult. The trial court sentenced him to 14 years in state prison. On appeal, defendant only challenges his conviction for human trafficking. We affirm the judgment.

I

FACTS

Jessica L. was 23 years old and worked as a home health aide when she bore her son. She grew up in a small farm area in Minnesota. Unable to pay her bills, she "moved from the country to the city," leaving her son with his father. She had a difficult time in the city when her car and driver's license were taken away because she had traffic citations and no insurance.

During this time, Jessica was advertising herself on the Internet as a prostitute in South Dakota. Defendant responded to her online advertisement. He did not describe himself as a pimp, and asked her many questions, such as whether she had kids, was close with her family, and if she finished school. Jessica told defendant she needed to "get [her] son back." She also told him about her financial problems, and that it was important for her to get her traffic tickets paid so she could get her license and car back and get "a regular job."

Defendant sent her pictures of a mansion and cars and told her, "This could be you." Jessica said, "I'm a country girl from the ranch. You don't see mansions or huge cars and everything." Defendant told her: "You could work for having stuff like this. Like, you know, you could earn this."

Defendant bought Jessica a bus ticket, and picked her up at the bus station in a new car. Jessica was impressed. He introduced her to a woman named Kelly. Kelly taught Jessica "how to answer the phone, how to talk to the right people, how to not talk to certain people. How to stay focused. Stay in pocket," which means "you don't talk to other pimps, you don't talk to other ho's. You don't miss a phone call, you don't miss a

2

text message." She was required to stay in constant contact with defendant or Kelly. Jessica was instructed not to speak with, "any guys that don't pull up as a trick or ask for a date." Nor was she permitted to speak with other prostitutes or law enforcement. Defendant helped her obtain fake identification, to use in renting hotel rooms.

Jessica got her son back before Christmas 2014. While she worked, defendant, Kelly or "another girl" watched the child. When her son was not with her, Jessica never knew where he was, nor where defendant was. When she wanted to see her son, she had to get defendant's permission. The amount of time Jessica was able to spend with her son depended on how much money she made and how fast she made it. Sometimes she asked to see her child, but defendant would not permit it. Jessica explained if she made money fast, she could have her son all night.

Jessica had a daily quota: "A thousand. I mean there is a lot, a lot, a lot of times I didn't make a thousand, but – but I tried." Jessica explained: "So like if I made a thousand one day, maybe I get the next day off or I get to sleep in and go out that night or sleep in and go out the day after that in the morning. The schedule is to get up early in the morning so I can make the hotel rent. And then I break and then for that, and then maybe keep on working then until lunch, or I have lunch, or just work all day." She had to walk up and down the street and "flirt, wave." The sex acts occurred in cars or rented rooms, which Jessica described as "trashy places." She was required to work even when she had her menstrual cycle. In Orange County, she worked in Anaheim and Santa Ana.

Jessica worked for defendant doing sex acts for money from November 2014 until the police became involved on April 18, 2015. During that time, she had four days off in total. Defendant took all the money Jessica made, although she was allowed to keep a small amount to pay for food, clothes, hotels, and to get her nails done. Defendant told her he bought her a car, showed her pictures of it, and told her it was in the shop.

3

When Jessica did not follow the rules, defendant, who is a foot taller than her, called her names, such as a "faggot punk bitch." She said she had to think before she spoke to defendant because he had a "stern reaction" and was "kind of just like a teacher or directing you or showing you what to say or how to say it." Jessica said the way defendant treated her made her "just kind of stay in [her] own bubble." She kept working "because I would get caught and yelled at."

Jessica felt defendant was always watching her and always knew where she was. He discouraged her from talking to her baby's father, and monitored her phone usage. When she spoke with "the wrong people," defendant took the phone away from her. Defendant changed Jessica's cell phone number three times. The phones defendant gave her to use did not have Internet access, and any time she used someone else's phone to see what her friends were doing on Facebook, defendant would find out, so she "gave up being on it." She felt "stuck" because she had to work every day, the hours were exhausting and she missed her son. Jessica told defendant multiple times that she wanted to go home and "stop doing this," and defendant would respond, "just wait." Jessica felt isolated from other people, was always crying and "just turn numb." She said at times, she "didn't understand what was happening."

Jessica received a $4,500 tax refund from a job she previously had, prior to prostitution. Jessica was able to keep about $320. Defendant took the rest. Defendant told her the money would be used for a car or an apartment for her.

*Jessica Decided to Flee*

On April 18, 2015, Jessica decided to sneak away in the middle of the night. She called her father and asked him to have the baby's father pick her up by a Walmart close to her motel later that night, at 12:30 a.m., because that was when she could get away from some people. She wanted to have her son and her luggage, and just "hop in" and "keep on driving." She told her father not to try to call her, explaining in

4

court that a call could come in "when I'm like on a date or if I'm with [defendant]." She said she was "scared and nervous."

Jessica's father spoke to the supervising police officer of the Orange County Human Trafficking Multi-Agency Law Enforcement Team at about 8:30 p.m. The police officer stated that the father sounded distraught, frustrated and "in a panic." After the police learned that Jessica was in a motel near the Walmart, they located her in a specific motel and set up surveillance in the general area. When they saw Jessica in the lobby, the supervisor and another officer, wearing police gear, entered the motel. As soon as Jessica saw them, she started crying.

The police determined Jessica's son was not with her, and they did not know where he was. At that point, the police believed the child was with a suspected human trafficker. The supervising police officer testified: "All of our scenarios have been where the child is being used as leverage to get the person to continue working." Until 4:00 a.m., the police worked toward finding the little boy. Jessica called defendant a couple of times to try to get him to bring her son to the motel. The police were present while defendant and Jessica spoke on the speaker phone. A police officer who was a member of the Orange County Human Trafficking Task Force overheard defendant "began yelling at her and calling her names." The officer added: "[Defendant] was on speaker when she was talking to him on the phone. I was standing across from her. She was sitting on the bed. And as he is yelling at her and asking her why she kept calling so many times, she started – she had the phone here in front of her [indicating], and she started to just kind of concave. She started to just kind of roll up as if she was just, 'He's yelling at me again,' and didn't want to experience it. She kind of rolled up a little bit, curled."

Eventually, defendant said on the phone that Kelly was complaining about babysitting, and that he was "tired of this kid shit man." Thereafter, a black Mercedes with defendant and the child inside pulled into the parking lot of the motel. Defendant

5

was detained and the child, who was approximately a year old, was recovered. The little boy was brought to Jessica's motel room. He ran toward her and they embraced each other.

Police searched defendant's car and found $3,300 in cash. One of defendant's ongoing text messages found on his cell phone stated: "LMPAO." An expert later explained this means "laughing my pimp ass off." A photo on defendant's cell phone showed an image of a white female standing next to a black male with the words: "White girls pay the bills." In a video on his phone, defendant referred to himself as a pimp.

*The Expert*

At trial, a deputy with the Orange County Human Trafficking Task Force, who was also deemed the investigating officer in this case, testified about pimp culture. Pimps solicit prostitutes to work for them by "selling the dream." The officer explained: "Selling the dream is basically the pimp getting to know the female he's looking to – he's looking to hire as one of his girls and getting to know her, getting to know what she needs. What is she looking for? What is she trying to do? Does she need money? Does she lack family? Does she not have close friends? You know, getting to know her. [¶] And then whatever he discovers or deems that she needs or she lacks in her life, he will somehow fulfill." With regard to Jessica, the expert said: "Well, in this case particularly, the false promises for Jessica were the car, the apartment, the nanny, and her being able to have all this money she was making."

The deputy said that pimps are constantly driving around where the prostitute is "posted on the track." The expert said prostitutes "have experienced where a pimp has parked across the street and has a steady eye on her to monitor what she's doing and/or they're frequently texting." The officer added: "The pimp is constantly texting her or calling her. 'Where are you at? I want you to walk this way. I want you to go that

6

way.  I want you to go to this corner or that corner.'"  It is common for pimps to stay at a hotel just down the street from the prostitute.

The investigating officer explained to the jury what a "faggot bitch" means in pimp culture:  "[T]hat is just describing someone who isn't down – who isn't down for the cause, who isn't willing to go – who isn't willing to stay on the track, who isn't willing to work through their menstrual cycle, who isn't willing to meet their trap; therefore, they are a faggot bitch or they are fagging off, which means that they're just not committed to the goal."

Based on training and experience, the expert explained that "pimping is when someone gains from another's material or financial gain knowing that that other person has engaged in commercial sex," and a case goes from pimping into human trafficking "[w]hen someone's personal liberty has been deprived of them and/or violated, it'll elevate the case.  It changes the dynamics of the case."  The officer opined that defendant violated Jessica's personal liberty "because Jessica did not have access to her child, her child was not readily available to her.  If she wanted to see her child, she had to ask for permission.  She had to earn her time spent with her child.  She was not free to leave.  She wouldn't have left without her child.  [¶]  Jessica was – Jessica was working up to seven days a week, long hours, making the money that was expected of her to make."

II

DISCUSSION

Defendant "concedes there was sufficient evidence to establish he was guilty of pandering and pimping; however, he challenges whether there was sufficient evidence to prove he violated Jessica's personal liberty and committed the crime of human trafficking."

Pandering is a crime that targets procuring a person for the purpose of prostitution; it has a sentencing range of three, four or six years in prison.  (Pen. Code,

7

§ 266i, subd. (a).)  (All further statutory references are to the Penal Code.)  Pimping is a crime committed when a defendant knows a person to be a prostitute and derives support or maintenance from the prostitute's earnings; it also has a sentencing range of three, four or six years in prison.  (§ 266h, subd. (a).)

Human trafficking entails a deprivation of liberty and carries the much heftier sentencing range of eight, 14 or 20 years in prison.  (§ 236.1, subd. (b).)  A person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services is guilty of human trafficking.  (§ 236.1, subd. (a).)  "'Deprivation or violation of the personal liberty of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out."  (§ 236.1, subd. (h)(3).)

In assessing a claim for insufficient evidence, the reviewing court will presume in support of the judgment every fact the trier of fact reasonably could infer from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  Thus, we have examined the entire record in the light most favorable to the judgment of conviction of human trafficking.

Defendant argues Jessica "was not abducted.  She stayed in her own hotel room, she bought her own food, she paid to have her nails done, and she had a cell phone.  While working for appellant, Jessica obtained physical custody of her son, and relied on appellant to watch him while she was working."  We understand counsel's argument.  Defendant did not have Jessica in chains.  She is an adult.  Defendant is basically arguing Jessica could have walked away at any time.

8

But Jessica says she stayed "in [her] own bubble," afraid she would "get caught and yelled at." The various restrictions defendant placed on Jessica, such as isolating her, constantly monitoring her, requiring her to stay in contact with him by phone, checking her phone, requiring her to work so much she was exhausted, falsely promising he had purchased a car for her and depriving her of the financial means to live rendered Jessica totally reliant on defendant. She was afraid of him, never knowing where he was. A police officer observed her cower as defendant shouted at her over the cell phone. From this record, a jury could have reasonably found that Jessica was isolated and kept dependent on defendant for her day-to-day sustenance, including food, shelter and money. Under these circumstances, we conclude there is substantial evidence of a substantial and sustained restriction of liberty accomplished through force, fear, fraud, deceit, duress or menace.

And then there's the baby. Defendant kept the child from his mother for four months, in a secret place, permitting Jessica to see him when he determined she earned that right and after he gave his permission. We note that the liberty interest in family privacy has its source in intrinsic human rights. (*Smith v. Organization of Foster Families for Equality & Reform* (1977) 431 U.S. 816, 845.) Accordingly, we further hold that when a pimp keeps a woman's baby away from her unless she makes enough money to satisfy the pimp, that is a substantial and sustained restriction of the woman's liberty accomplished through force, fear, fraud, deceit, duress or menace.

Something far more serious and sinister than a pimp deriving support or maintenance from the prostitute's earnings was occurring here. Under the circumstances disclosed in this record, we find there is substantial evidence to support the jury's verdict that defendant committed human trafficking.

9

*Court's Instructions*

Defendant next argues the trial court erred in not instructing the jury on the lesser included offense of attempted human trafficking. The Attorney General agrees that attempted human trafficking is a lesser included offense of the crime of human trafficking, but argues the court was not required to provide the jury with an instruction on attempted human trafficking because there was no substantial evidence to support it.

The trial court is obligated to instruct on lesser included crimes "if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not the lesser." (*People v. Blair* (2005) 36 Cal.4th 686, 745, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*People v. Blair*, *supra*, 36 Cal.4th at p. 745.)

Here, the evidence demonstrates defendant coerced Jessica to work as a prostitute by controlling when she could see her son. The jury could not have found that he only attempted to deprive Jessica of her liberty but was unsuccessful. Thus, there was no basis for an instruction on attempted human trafficking.

Even assuming the trial court had been required to instruct the jury on attempted human trafficking, however, any resulting error was harmless. We conclude it is not reasonably probable that a result more favorable to defendant would have been reached had the court instructed the jury on attempted human trafficking. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837.)

*Pitchess Motion*

Under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, prior to trial, defendant moved to discover the peace officer records of the investigating officer

10

pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 and Evidence Code sections 1043-1046. In this appeal, he asks this court to review the trial court's in camera hearing transcripts "to determine whether the trial court properly exercised its discretion.

Our review of the trial court's *Pitchess* motion determination is for an abuse of discretion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228.) In *Mooc*, the Supreme Court held that in order to preserve the defendant's ability to obtain appellate review of the denial of a *Pitchess* motion, the trial court should make a record of the documents it reviewed in camera, either by photocopying the documents, preparing a written list of the documents it reviewed and/or stating on the record the documents it reviewed. (*Id*. at p. 1229.) Discoverable information generally includes limited information from a peace officer's confidential personnel records that is potentially relevant to the defense—either a proposed defense or the impeachment of an officer. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021-1022.)

We have independently reviewed the sealed reporter's transcript of the in camera proceedings, as well as the defendant's motion. During the in camera proceeding, the trial court reviewed the personnel files of the investigating officer that were provided by the custodian of records. The documents are described and were reviewed by the court. We are satisfied that the court did not abuse its discretion by finding there was no information to disclose. (*People v. Byers* (2016) 6 Cal.App.5th 856, 869.)

11

### III

### DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.