Filed 9/17/20  P. v. McGraw CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>ELIJAH COTTON MCGRAW,<br><br>　　　Defendant and Respondent. | F078342<br><br>(Super. Ct. No. VCF366800)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Tim Ward, District Attorney, Dan Underwood, Chief Deputy District Attorney, Dave Alavezos, Assistant District Attorney, and Jamil Nushwat and Adam Clare, Deputy District Attorneys, for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Elijah Cotton McGraw filed a Penal Code[1] section 995 motion to set aside counts 1, 2, 4, and 5 of an information charging him with human trafficking of J.Z.

---

[1]　　　Undesignated statutory references are to the Penal Code.

(§ 236.1, subd. (b); count 1); human trafficking of J.C. (§ 236.1, subd. (b); count 2); pimping of J.Z. (§ 266h, subd. (a); count 3); pandering by procuring as to J.Z. (§ 266i, subd. (a)(1); count 4); pandering by encouraging as to J.Z. (§ 266i, subd. (a)(2); count 5); and pimping of J.C. (§ 266h, subd. (a); count 6), each with enhancements for having suffered two prior prison terms (§ 667.5, subd. (b)). The superior court granted the section 995 motion in part and dismissed counts 1 and 2.

The People appeal, arguing the evidence presented at the preliminary hearing was sufficient to establish probable cause that defendant committed human trafficking as to both J.Z. and J.C.[2] We agree and therefore reverse the superior court's order dismissing counts 1 and 2 of the information against defendant under section 995.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was initially charged with human trafficking as to J.Z. (§ 236.1, subd. (b); count 1), pimping as to J.Z. (§ 266h, subd. (a); count 2), and pimping as to J.C. (§ 266h, subd. (a); count 3).

*Preliminary Hearing*

The only witness to testify at the preliminary hearing was Martha Rodriguez, a criminal investigator for the Tulare County District Attorney's Office. She testified both as the investigating officer and an expert in human trafficking. Her testimony regarding the events at issue was based primarily on text messages and Facebook communications.

Rodriguez explained that she was contacted by a detective with the Hanford Police Department after a search of defendant by that department revealed motel receipts from the City of Visalia and advertisements on Backpage.com, a website used to advertise prostitution. Additionally, multiple cell phones were collected from defendant, and activity on the phones related to prostitution. Rodriguez reviewed defendant's Facebook profile and recognized one of the photographs from another Facebook profile she

---

[2] Defendant did not file a respondent's brief or any other briefing in this appeal.

previously had examined during a separate investigation.  Rodriguez eventually identified several Facebook profiles linked to defendant.

On May 20, 2016, Rodriguez conducted an undercover operation at a motel in Visalia, where she encountered J.C.  J.C.'s cell phone was seized during that operation.  J.C.'s phone number was associated with advertisements on Backpage.com.  Messenger messages extracted from the phone showed communications between J.C.'s Facebook profile and a Facebook profile associated with defendant.  J.C.'s phone also contained a contact labeled "Daddies," with whom she discussed prostitution.  Rodriguez later associated the phone number for "Daddies" with one of defendant's aliases.  The prosecutor questioned Rodriguez regarding a series of text messages between J.C. and the "Daddies" contact on May 14, 2016:

> "Q     Do you remember how the morning started in regards to those text messages?
>
> "A     The thread of messages started with [defendant] telling her that she had one post left, and her telling him that she hadn't, quote, 'made shit.'  And then later on they talk about posting, and what the heading of the post was supposed to read.
>
> "Q     And when you read the messages in that context, what do you take 'posting' to mean?
>
> "A     In the context of pimping, prostitution, posting, I take that to mean posting on the [I]nternet, posting an advertisement online.
>
> "Q     Did she refer to getting calls for Greek?
>
> "A     Yes, she did.
>
> "Q     And what is that?
>
> "A     Greek in the pimping subculture is a term used to refer to anal sex.
>
> "Q     And what was the heading that she said they should put as their heading on Backpage?

3.

"A    I'll read it straight from here. 'New Number Sexy Latina Available Now in-Calls Only.'

"Q    And what is an in-call?

"A    An in-call is a meeting arrangement to exchange sex acts for money where the female providing the sex act stays at her location and the purchaser goes to her location.

"Q    And when [J.C.] had told Daddy to change the heading, what was his response?

"A    He said he was waiting for Bitcoins."

Rodriguez explained that Bitcoin is a form of cryptocurrency that is difficult to trace. The prosecutor then continued questioning as follows:

"Q    And within that date range did Mr. -- did Daddy and [J.C.] talk about trap?

"A    Like I mentioned, there were messages where he would -- the Daddies contact would ask [J.C.] what the trap was looking at.

"Q    What does trap mean?

"A    The money that's been made.

"Q    And at some point in time did [J.C.] tell him that she left?

"A    Yes, she did.

"Q    What was his response?

"A    No one told her to leave.

"Q    And did he use a derogatory term? [¶] … [¶]

"A    The exact quote or the exact text was 'Bitch who told you to leave.' "

Rodriguez also discussed text messages between J.C. and defendant that were retrieved from a phone seized from defendant. On August 8, 2017, J.C. and defendant discussed J.C. engaging in prostitution. When J.C. told defendant she had just one

4.

"date,"[3] he told her to get back out there. On August 10, 2017, defendant messaged J.C., "Bitch don't tell me you're asleep. If you're asleep, I'm beating your ass." Later that same day, he threatened, "Even if I think you're lying to me, I would beat your ass."

On August 19, 2017, J.C. asked defendant to take "Greek" off an advertisement, and defendant refused. Defendant told J.C. that he was "serious about that shit," and said, "For real, get my money, I don't give a fuck." During the same exchange, J.C. asked to see her friends, and defendant responded that he would not allow her to do so. On August 20, 2017, defendant asked J.C. "why she was in the room when she wasn't busting dates," and "to keep them coming."

Rodriguez also testified to messages exchanged between defendant and J.Z. Rodriguez explained that defendant and J.Z. started their relationship in November 2017, after defendant took her or stole her from another pimp. In Facebook messages, J.Z. asked defendant whether she could go to Reno and he responded that, if she did, it would be to "get the trap, and he would be upset if the cousin's man went with her."

On November 21, 2017, defendant messaged J.Z., stating that the guy she was with "better have a lot of money" because J.Z. had been gone for three hours. J.Z. told defendant she would have defendant's money in the morning. He responded, "Nah, bitch, you got me fucked up …. And you're getting your ass beat." He further stated, "I already told you … you fucked up; that's strike one; just know you're getting your ass beat period; cuz you on some weird shit right now and you got me fucked up on my son just so you know." Defendant also told J.Z. she was "going to get her ass whooped, that there was no way around it." J.Z. asked defendant not to touch her because she "didn't want to go to her family looking dumb." Defendant responded, "I ain't gonna touch bitch." J.Z. told defendant that "she was gonna have his money and she wanted her

---

**3**      Rodriguez explained that, in the context of prostitution, a "date" involves an exchange of money for a sex act.

5.

stuff." However, based on further messages, it appears she continued working for defendant after this exchange.

On December 8, 2017, J.Z. stated, "How much would I need if I wanted to go my separate way."[4] Defendant responded, "Go your separate way," and then asked if she was serious. J.Z. stated, "You don't trust me."

On January 2, 2018, J.Z. told defendant she didn't want to be a hoe anymore and was done with "fuckin' strangers." Defendant responded that "he only had her do it about five times a month." Defendant also said, "You don't have to explain, we can part as friends." Rodriguez acknowledged that defendant did not threaten J.Z. when she expressed a desire to leave. Rodriguez did not know whether any of the written disagreements between defendant and J.Z. actually resulted in physical violence.

On February 1, 2018, defendant sent J.Z. pictures that read, "I Love You," "I Miss You So Much," and "Thinking of You." Rodriguez opined that it appeared defendant and J.Z. were in a romantic relationship. Rodriguez testified that pimps may romance their victims to keep them "in pocket."

At the conclusion of the evidence, defense counsel argued there was no evidence to support a charge of human trafficking and the case was strictly a "pimping case." The court found there was not sufficient evidence to establish probable cause that defendant had restricted J.Z.'s liberty with the intent to commit pimping. The court found instead that the relationship was consensual "from start to finish," and the sole threat of violence issued by defendant did not appear to be a restriction on J.Z.'s personal liberties for purposes of pimping. Accordingly, the court found probable cause to hold defendant to answer for counts 2 and 3, but not count 1.

---

[4]     Rodriguez explained that, when a prostitute chooses to leave her current pimp, the prostitute or her new pimp must pay a fee in order to leave.

*Information and Section 995 Motion*

Following the preliminary hearing, the People filed an information charging defendant with human trafficking of J.Z. (§ 236.1, subd. (b); count 1); human trafficking of J.C. (§ 236.1, subd. (b); count 2); pimping of J.Z. (§ 266h, subd. (a); count 3); pandering by procuring as to J.Z. (§ 266i, subd. (a)(1); count 4); pandering by encouraging as to J.Z. (§ 266i, subd. (a)(2); count 5); and pimping of J.C. (§ 266h, subd. (a); count 6), each with enhancements for having suffered two prior prison terms (§ 667.5, subd. (b)).

Thereafter, defendant filed a section 995 motion to set aside counts 1, 2, 4, and 5 of the information. As to counts 1 and 2, defendant argued the evidence at the preliminary hearing did not show a substantial or retrained restriction of the liberty of either J.Z. or J.C. In ruling on the 995 motion, the court stated:

> "The key for me as to Counts 1 and 2 is that the question does the evidence show that the defendant deprived or violated personal liberty with the intent to engage in pimping.
>
> "As to J.C., the only deprivation of her liberty was his refusal to let her go see her friends, and so that wasn't an intent to deprive her of her liberty to engage in a crime just to see her friends. So that's where that falls for me. [¶] … [¶]
>
> "As to J.Z., … I just didn't really see any evidence that he deprived her of her liberty or violated her personal liberty."

Accordingly, the court granted the section 995 motion as to counts 1 and 2, and those counts were dismissed. The court denied the section 995 motion as to counts 4 and 5.

The People timely appealed the court's partial grant of the section 995 motion.

## DISCUSSION

An information, or a charge therein, must be set aside pursuant to section 995 if the defendant was committed without reasonable or probable cause. (§ 995, subd. (a)(2)(B).) "To establish probable cause sufficient to withstand a section 995

7.

motion to dismiss, the People must make some showing as to the existence of each element of the charged offense." (*People v. Chapple* (2006) 138 Cal.App.4th 540, 545.) "Probable cause exists if a person ' " ' "of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion" ' " ' that the defendant committed the crime." (*Galindo v. Superior Court* (2010) 50 Cal.4th 1, 8; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 654 ["The term 'sufficient cause' in section 872, subdivision (a) ' "is generally equivalent to 'reasonable and probable cause' " ' in section 995, subdivision (a)(2)(B), i.e., ' "such a state of facts as would lead a [person] of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." ' "].)

"Evidence that will justify a prosecution need not be sufficient to support a conviction." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.) Thus, the showing required to overcome a motion to dismiss all or part of the information is "exceedingly low," and an information " ' "should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged." ' " (*People v. Black* (2017) 8 Cal.App.5th 889, 898.) " ' " 'Reasonable and probable cause' may exist although there may be some room for doubt." ' " (*People v. Mower* (2002) 28 Cal.4th 457, 473.)

"Insofar as the Penal Code section 995 motion rests on issues of statutory interpretation, our review is de novo. [Citation.] Insofar as it rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendants to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt' [citations]." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).)

Human trafficking "is comprised of three distinct offenses" set forth in section 236.1, subdivisions (a) through (c). (*People v. Shields* (2018) 23 Cal.App.5th

1242, 1248–1249.)  Here, defendant was charged with human trafficking as set forth in section 236.1, subdivision (b), which applies where a person "deprives or violates the personal liberty of another with the intent to effect or maintain a violation" of one of several specific crimes, including pimping (§ 266h) and pandering (§ 266i).  (§ 236.1, subd. (b).)  " 'Deprivation or violation of the personal liberty of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out."  (§ 236.1, subd. (h)(3).)

In *People v. Guyton* (2018) 20 Cal.App.5th 499 (*Guyton*), the defendant challenged his conviction for human trafficking on the ground it was not supported by substantial evidence.  (*Id.* at p. 506.)  However, the court found "substantial evidence of a substantial and sustained restriction of liberty accomplished through force, fear, fraud, deceit, duress or menace," where the victim was isolated, constantly monitored, required to stay in contact with the defendant by phone, required to submit to checks of her phone by the defendant, required to work to exhaustion, deprived of the financial means to live, totally reliant on the defendant for her day-to-day sustenance, and visibly fearful of him. (*Id.* at p. 507.)

In the instant case, the evidence against defendant was not as extensive as that presented in *Guyton*.  *Guyton*, however, examined whether the evidence was sufficient to support a conviction.  (*Guyton*, *supra*, 20 Cal.App.5th at p. 506.)  Here, we examine only whether the evidence is sufficient to justify a prosecution.  We conclude the evidence presented was sufficient to lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion that defendant committed human trafficking as to both J.C. and J.Z., and therefore provided probable cause to believe the offenses had been committed.  (*Galindo v. Superior Court*, *supra*, 50 Cal.4th at p. 8.)

9.

As to J.Z., the superior court found the preliminary hearing testimony did not support a charge of human trafficking because the relationship between J.Z. and defendant was consensual, and the court did not see evidence that defendant deprived J.Z. of her liberty. While it is true that the preliminary hearing testimony suggested a romantic relationship between J.Z. and defendant, Rodriguez testified that pimps typically use such relationships to keep a victim "in pocket." Accordingly, drawing all reasonable inferences in favor of the information (*Lexin*, *supra*, 47 Cal.4th at p. 1072), there was at least some evidence to suggest that defendant's romantic overtures to J.Z. constituted a form of coercion for purposes of maintaining and furthering his efforts at pimping and pandering.

Other evidence also suggests a coercive and threatening relationship between defendant and J.Z. Defendant threatened J.Z. with violence when she was gone for three hours following a "date." J.Z. stated, on more than one occasion, that she no longer wished to prostitute herself for defendant and, although defendant indicated J.Z. was free to leave, she did not do so. A reasonable inference from this conduct is that J.Z.'s reluctance was due, at least in part, to the coercive nature of her relationship with defendant. Additionally, J.Z. requested permission to travel out of the area, and defendant told her she could only do so for purposes of prostitution. That J.Z. felt the need to request permission to travel, and that such permission was granted only to the extent the travel involved prostitution, suggests defendant substantially restricted J.Z.'s liberty with the intent to commit pimping and/or pandering. While the evidence in support of the human trafficking charge was not as overwhelming as that presented in *Guyton*, it was nonetheless sufficient to establish probable cause.

As to J.C., the evidence at the preliminary hearing showed that defendant controlled J.C.'s movements and behavior for purposes of committing pimping, and that he did so through coercion, threats, duress, and menace. Defendant threatened to beat J.C. on more than one occasion, including for sleeping at times he did not approve or

10.

raising a suspicion she might be lying.  Defendant became upset when J.C. left a location without his permission.  When J.C. asked to remove references to sodomy from her advertisements, defendant refused, indicating he did not care about her wishes and only wanted her to "get [his] money."  When J.C. asked to see her friends, defendant refused. Notably, there was no apparent relationship between J.C. and defendant, other than facilitating prostitution.[5]  We therefore do not find a basis for the superior court's conclusion that refusing to permit J.C. to see her friends was unrelated to an intent to commit pimping.  Drawing all reasonable inferences in favor of the information (*Lexin*, *supra*, 47 Cal.4th at p. 1072), we find this evidence sufficient to establish probable cause that defendant committed human trafficking of J.C.

## DISPOSITION

The superior court's order granting in part defendant's motion pursuant to section 995 and dismissing counts 1 and 2 of the information is reversed.  The matter is remanded for further proceedings.


DE SANTOS, J.

WE CONCUR:


MEEHAN, Acting P.J.


SNAUFFER, J.

---

[5]    In the superior court, defendant attempted to imply that J.C. and defendant had a friendly relationship based on an interaction in which J.C. worried that her son would not love her, and defendant reassured J.C.  However, this discussion immediately followed defendant's threat to beat J.C. if she was asleep.  In context, such reassurances may suggest a coercive attempt to maintain J.C.'s willingness to engage in prostitution.

11.