Filed 12/27/21  P. v. Clark CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PERRY TERRELL CLARK et al.,<br><br>    Defendants and Appellants. | B305709<br><br>Los Angeles County<br>Super. Ct. No. MA072529 |

APPEALS from judgments of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant Perry Terrell Clark.

Rudolph J. Alejo, under appointment by the Court of Appeal, for Defendant and Appellant Javionna Starlena Richmond.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

1

A jury convicted Perry Terrell Clark and Javionna Starlena Richmond of human trafficking for commercial sex acts. Three of the victims were minors. As to two of the victims, the jury found true a sentencing factor that the crimes involved force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury. The jury also convicted Clark of robbing one of the victims. On appeal, Clark and Richmond assert instructional error and insufficient evidence. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

1. ***The four victims***

a. *Wendy S.*

In 2014, when she was 14, Wendy ran away from her group home and started working as a commercial sex worker. In the spring of 2015, Wendy met Clark, whom she knew as "P.C." Clark told Wendy "he had a girl working for him" and Wendy could make up to $1,500 a day.

Richmond, whom Wendy knew as "J.J.," contacted her on Facebook or by text. Richmond was Clark's "baby mother." Richmond asked, "[O]h, can I pull up on you and we'll smoke?" Wendy agreed. The next day, Wendy and her friend called Clark to pick them up. Clark picked her up, they "got drunk and . . . smoked," and then Clark took her to Los Angeles "to go on the blade."[1]

Wendy worked about 10 hours that night. Clark "felt like he needed more money." He told Wendy, "[Y]ou're not leaving. You have to stay and have to make more money." This pattern continued. Sometimes Wendy took "pills just trying to stay up." Wendy gave the money she made to Clark "immediately"; she kept none of it.

---

[1] The "blade" or the "track" is "the streets where prostitutes walk on," such as Figueroa in Los Angeles.

2

Clark began to rent rooms at the E-Z8 motels in Lancaster and Palmdale.  Then Richmond "post[ed]" Wendy on Backpage, a website where you could "post a picture of yourself" "if you want to sell your body."[2]  Clark made Wendy "do in-calls."  He also took her to "out-calls," where you "go[ ] to their place."  Wendy was getting 20 "dates" a day.  Clark and Richmond were setting her schedule and arranging her dates, and Clark set the prices.

Richmond "was involved the whole time."  She created Wendy's ads for Backpage and took calls from the tricks.[3]  The Backpage ads had Richmond's phone number.  Richmond was "on the phone getting us dates."  She also collected the money.  Wendy never told Richmond no because—for example—if she didn't give Richmond the money, Clark "was gonna do whatever it takes to take it from me."

One time, Wendy told Clark she didn't want to have any more dates.  He laughed and told her to get out of the car.  When she didn't, he "lock[ed] the doors," pulled her hair, and "hit[ ] [her] against the window in the car."  "And he told me that I was gonna work for him."  This type of thing was common; it happened "[w]henever he would be mad."

If Wendy kept any of the money she got from dates, Clark beat her.  Once Wendy got an extra $40 as a tip.  She hid it in her dirty clothes.  When Clark found it he "lift[ed her] up" from the bed and "threw" her.  "[T]hen he started kicking [her] and stomping [her] when [she] was on the floor."  Clark called Wendy

---

[2]    Backpage.com is now defunct.  (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1092 (*Oliver*).)

[3]    A "trick" or a "John" is "the guy [who] comes and pays for the services."

"a stupid bitch." Richmond was there when Clark assaulted Wendy. She didn't say anything, do anything, or try to stop him.

Another time Wendy had $20 in her makeup pouch. Clark found it, took it, and beat her up.

Wendy worked out of motel rooms about 80% of the time. She was not allowed to leave the room without permission. If she tried to leave, she "got beat."

Wendy worked for Clark and Richmond for 18 to 24 months. Eventually, Wendy felt Clark was "really, really making" her "catch a lot of dates," so she called her uncle and cousin to pick her up.

A couple of months later Richmond messaged Wendy on Facebook. Richmond picked her up and drove to a McDonald's. Clark walked up and got into the car. Richmond drove them to her (Richmond's) house. Clark told Wendy, " 'You're gonna work for me.' " Wendy said she was not going to work for him. Clark "snatched" her phone and broke it, then took her purse with her wallet in it. He "sock[ed]" her with a closed fist in the face, forehead, eye area, nose, and jaw 40 to 50 times. He also kicked her 10 to 15 times. Wendy was "dripping blood everywhere." Even a year later, Richmond was still contacting Wendy about working for her and Clark.

   b.    *Lauren R.*

Detectives interviewed Lauren R. in the autumn of 2017. Lauren identified Clark and Richmond in photo six-packs. However, at trial, Lauren at first claimed not to remember anything beyond the fact that she had participated in commercial sex at the E-Z8 in Lancaster. She testified "P.C." and "J.J." had been at the E-Z8 with her, but initially she claimed not to recognize Clark or Richmond in the courtroom. After the prosecutor showed Lauren a transcript of her preliminary

4

hearing testimony, she admitted Clark had picked her up at 77th and Figueroa in Los Angeles.

Clark had been following Lauren in his car and she "confronted the car." Lauren got into the car, and she and Clark had a conversation about "[m]aking money"; to her that meant "[p]rostitute." "He said to make money with him" and he was going to take care of her. She was 16 at the time.

Lauren felt "very dazed, confused; out of it." "It felt like something had been in [her] arm"; she believed Clark put a needle in her arm. Clark admitted he'd put something in Lauren's arm but he never said what it was. Lauren "[woke] up" on the freeway, and Clark said they were going to Lancaster. Clark said Lauren "would try it out" and, once she'd made $10,000 for him, she could leave Lancaster if she wished.

Richmond got Lauren a room at the E-Z8 in Lancaster and took her to get some clothes and get her nails done. Lauren figured she was going to have to "prostitute" in exchange. Richmond took Lauren's picture and posted ads; Lauren started "catching dates." Lauren did both in-calls and out-calls. Richmond drove her to the out-calls.

Clark and Richmond determined how much Lauren would charge. She gave them all the money. Sometimes Clark punched Lauren in the stomach with a balled-up fist. She couldn't remember why he hit her, but "it was usually, in [her] opinion, over money." Clark asked Lauren for "a blow job a couple [of] times" and she felt she couldn't say no. She couldn't say no to Richmond either "[b]ecause they're a team, and I'm working for both of them." Lauren feared not doing what Richmond asked because "[s]he was like the shot caller." "She arranged the dates," took Lauren to out-calls, got her clothes. "[I]t seemed like she was . . . the one in control."

5

Lauren stayed with Clark and Richmond between a week and a month. She did not feel she could come and go as she pleased. When Lauren ran out of methamphetamine, Clark would get some for her. Lauren was "catching dates non-stop"; she was "doing a lot more" drugs than she had before coming to Lancaster because the drug was her "happy place." It also helped her stay awake so she could catch more dates. Eventually a customer helped Lauren get away.

c.     *Faythe S.*

Faythe S. met Clark at a gas station in about 2015. She was 18. They exchanged information. About a week later they met up, hung out, and smoked. Clark explained he was a pimp, "he had hoes"; he told Faythe she could work for him. Faythe started working for Clark on Sepulveda, where there were "[h]oes, pimps, tricks."

Richmond went to Sepulveda with Faythe four or five times. On Sepulveda, Faythe would have seven or "maybe more" dates in one night. Richmond also got Faythe rooms on Sepulveda and at the E-Z8 in Palmdale. Faythe's Backpage ads had a contact email of queenjavey185@gmail.com and a telephone number of 323-900-9279. Those were not Faythe's email or phone number.

In a 24-hour period, Faythe would have four dates for cash and ten or more using bitcoin. Clark gave her "crystal meth" so she could stay up. Richmond provided Faythe with condoms and got her clothes. Clark and Richmond set Faythe's prices and she gave them the money. "I ha[d] to give it to them." She never kept any for herself.

Sometimes, when Faythe "finished all the condoms" she'd been given, she could stop getting dates for that night. But other times Clark told her she had to keep working. She didn't feel she could say no; Clark "was very angry" and would "curse [her] out"

6

and call her "bitch" and "ho" when she was "being lazy." "And [he] told me I needed to work—go back to work." Once, Faythe was raped on Sepulveda. She told Clark and Richmond. Clark told her to go back to work. Faythe was scared Clark was going to get violent.

Faythe saw how Clark treated Wendy: "He treated her bad." He yelled at her. When asked, "[W]as it violent?" she responded, "Yes."

When asked if she "could really stop working for" Clark and Richmond, Faythe answered, "Yeah." When asked if she was allowed to come and go as she pleased, she again said, "Yeah." Faythe testified she didn't have a car but she could use Richmond's and Clark's car.

Faythe worked for Clark and Richmond for five or six months. In 2015 or 2016 she went to jail. Sometime later, Richmond texted her to see if she was "interested again." Faythe told Richmond she was not.

On cross-examination Faythe testified Clark and Richmond didn't "force[ ] [her] into being a commercial sex worker for them." She said Clark never hit her.

d. *Carly C.*

On October 17, 2017, Santa Ana Police Department Detective James Marquez was working vice around 4:00 a.m. in an area that's "the most famous track in Orange County." Marquez saw a young woman—later identified as Carly C.— standing on a corner in the "track area of the city." She was "paying attention to motorists passing by." Marquez watched Carly for about 45 minutes and saw her "contact two separate vehicles . . . occupied by solo male drivers."

Marquez spoke with Carly later at the police station. She was 17. He asked her if he could scroll through her cell phone and she agreed. Based on text messages on the phone, Marquez

7

"was concerned that she was being pimped out or trafficked." He saw contacts for "P.C." and "J.J." When Marquez asked Carly if her pimp "was treating her all right," she replied, "[Y]eah, it's nothing." But then she seemed to "[catch] herself" and denied she had a pimp. Carly admitted she had a "male friend" to whom she gave money but she didn't want to name him. She also told Marquez that "J.J. had somebody watching over her while she was at the track to make sure that she was safe."

In 2017 Detective Gary Furuyama was part of the sheriff's department's human trafficking task force. On October 30, 2017, he posed as a "commercial sex buyer" under the supervision of Detective Julia Levenson. Furuyama texted and called a number listed in a Backpage ad for a "hot Brazilian" in Lancaster. He was told the charge would be $60 for "[a] blow job and a handjob," and he should go to room 225 at the E-Z8 motel.[4]

When Furuyama got to the top of the stairs leading to the room, he passed Richmond. She seemed to be coming from room 225. In the room, Furuyama met Carly, whom he recognized from her photo in the ad. Furuyama handed Carly cash in marked bills. She put the money in the nightstand and retrieved a condom from a suitcase. Furuyama gave a signal to other officers who then knocked loudly on the door, announcing it was law enforcement.

At trial, Carly testified she did not want to be a witness "at all." She said, "I did everything on my own." Carly testified she met Richmond through a friend in early 2017. They "were

---

[4]     The prosecution introduced a receipt for the E-Z8 motel in Lancaster with Richmond's name on it. The receipt showed Richmond paid cash for room 221 for the dates of October 16 and 17, 2017, and for room 225 for the dates of October 18, 19, 20, and 21, 2017.

very close" and "spen[t] a lot of time together." In the fall of 2017, Carly "decided [she] wanted to be a prostitute." Richmond, who "was [her] best friend at the time," "didn't like [her] doing dates."

Carly denied Richmond ever did anything to help her "catch dates"; Richmond didn't take pictures of her for ads or post ads for her, nor did she ever drive Carly to the blade. Carly admitted she'd worked out of a room at an E-Z8 motel, but she denied Richmond or Clark ever rented that room.[5] Carly said, "I would have a friend do it," but when asked, "What friend?" she replied, "I don't have any names."

Carly denied she ever communicated with Clark "about anything commercial sex-related" or ever gave him any money. She testified she had no knowledge of Clark or Richmond being pimps.

2.     ***The charges, trial, verdicts, and sentences***

The People charged both defendants with two counts of human trafficking of a minor for a commercial sex act by force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury in violation of Penal Code section 236.1, subdivision (c)(2)[6] (counts 1 [Wendy S.] and 4 [Lauren R.]); one count of human trafficking of a minor for a commercial sex act in violation of section 236.1, subdivision (c)(1) (count 3 [Carly C.]); and one count of human trafficking in violation of section 236.1, subdivision (a) (count 5 [Faythe S.]). The People also charged Clark with second degree robbery of Wendy S. (count 2).

Both defendants chose not to testify.

---

[5]     The prosecution introduced another receipt from the E-Z8 showing Clark paid cash for room 222 on October 18, 2017.

[6]     References to statutes are to the Penal Code.

9

The jury convicted the defendants on all counts and, on counts 1 and 4, found true the sentencing factor that the crimes involved force, fear, or the like. The trial court sentenced Clark to 45 years and eight months to life in the state prison. The court imposed indeterminate terms of 15 years to life on counts 1 and 4. On count 3 the court chose the upper term of 12 years. On counts 2 and 5 the court imposed one-third the midterms of one year and two years eight months, respectively, to be served consecutively.

The court sentenced Richmond to 40 years and eight months to life in the state prison. Again, the court imposed indeterminate terms of 15 years to life on counts 1 and 4. On count 3 the court chose the midterm of eight years. On count 5 the court imposed one-third the midterm of two years eight months, to be served consecutively.

## DISCUSSION

### 1. *There was no instructional error on counts 1 and 4*

Clark contends the trial court prejudicially erred when it instructed the jury that the sentencing factor of force, fear, or the like requires only general intent. Richmond joins in this argument.

a. *The trial court instructs the jury with instructions counsel have agreed to and approved*

Section 236.1, subdivision (c) provides, "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [specified sections of the Penal Code] is guilty of human trafficking." Subdivision (c)(1) provides for punishment of five, eight, or 12 years and a fine. Subdivision (c)(2) provides for a sentence of 15 years to life "when the offense involves force, fear, fraud, deceit, coercion,

10

violence, duress, menace, or threat of unlawful injury to the victim or to another person." (§ 236.1, subds. (c), (c)(1) & (c)(2).)

As noted, the People charged defendants with two counts of violating section 236.1, subdivision (c)(2) (section 236.1(c)(2)), naming as victims Wendy S. and Lauren R. (counts 1 and 4, respectively). The People also alleged one count of violating section 236.1, subdivision (c)(1) (section 236.1(c)(1)), naming Carly C. as the victim (count 3). Before testimony began, the court discussed possible jury instructions with counsel.[7] The court noted a violation of section 236.1(c)(1) is essentially a lesser crime of a violation of section 236.1(c)(2). The court proposed instructing the jury on the elements of section 236.1(c)(1) and then having the jury make "true" or "not true" findings on the "enhancement allegation" that the offense involved force, fear, or the like. The court said, "I think that's the most efficient and least confusing way to do it." The court continued, "Because . . . (c)(2) is just a sentencing enhancement. If (c)(1) is committed, was it committed under these circumstances?" None of the lawyers objected to the court's proposal.

Toward the end of trial, the court again discussed jury instructions with counsel. The court noted it had given counsel

---

[7]    The issue came up in the context of the prosecution's motion in limine to preclude defense counsel from asking the alleged victims about their "voluntary" conduct or "consent." The court noted "consent" is not a defense when the victim was a minor. (§ 236.1, subd. (e).) The court suggested defense counsel could cross-examine the victims by asking, for example, if Clark threatened them with violence or tricked them into thinking they were going to a party. Clark's counsel replied, "I think the court's ruling is fair and it addresses the concerns of both parties."

11

a set of proposed instructions the previous week. The court again raised the issue of how to instruct on counts 1 and 4.

> "[T]here are two separate ways to deal with the charges here. . . . [¶] You can either instruct as to (c)(2) and then give (c)(1) as a lesser instruction, or you can give a (c)(1) instruction and then give (c)(2) as a further allegation. [¶] I think the much cleaner way to go is to instruct first as to (c)(1) and then have the allegation as to (c)(2). It's cleaner in the verdict form. It's easier to understand, especially here where we have count 3, which is a separate count of (c)(1). [¶] Subdivision (c)(2) is only a sentencing provision. If it's found that the violation of (c)(1) was under certain conditions, then it's an enhanced sentence. So I set up the instruction that way, to give [CALJIC No.] 9.62.4 after [CALJIC No.] 9.62.3; meaning that's the allegation applied to counts 1 and 4."

The court then asked both defense attorneys, "Do you have any opposition to that?" Both replied, "No." All counsel then confirmed they had no objection to any of the proposed instructions, nor were they requesting any additional instructions.[8]

The court instructed the jury with CALJIC No 9.62.3 on the elements of a section 236.1(c)(1) violation and CALJIC No. 9.62.4 regarding the allegation that the crime "involved force, fear,

---

[8]     Clark's counsel had raised an issue about the definition of "debt bondage," as used in CALJIC No. 9.62.4. The court had found a definition in a case and added it to the instruction; Clark's counsel was satisfied.

12

fraud, deceit, coercion, violence, duress, menace, or the threat of unlawful injury." CALJIC No. 9.62.3 included the requirement that "[t]he person did so with the specific intent to effect or maintain a violation of section 266h of the Penal Code." The court also gave the jury the elements of section 266h, pimping. In addition, the court gave CALJIC No. 3.30, instructing the jury that, for the allegation in counts 1 and 4 that the offense involved force, fear, or the like, "there must exist a union or joint operation of act or conduct and general criminal intent."

b. *No authority supports defendants' contention that the sentencing factor of force, fear, or the like requires specific intent*

Clark asserts the court's instruction on general intent for the "force or fear" allegation "relieved the prosecution of its burden of establishing a facilitative nexus between [Clark's] application of the force or coercion and the specific intent to cause or otherwise persuade the minor to engage in the commercial sex transactions for [Clark's] benefit." It's unclear what Clark means by this.

The court instructed the jury that, to prove trafficking in counts 1, 3, or 4, the People were required to prove that the defendant "cause[d], induce[d], or persuade[d], or attempt[ed] to cause, induce, or persuade" a minor "to engage in a commercial sex act, *with the specific intent* to effect or maintain a violation of section 266h," pimping. (Italics added.) If, and only if, the jurors found the People had proved that, then they were to decide if the allegation that the crime "involved force, fear," or the like was true or not true. (See CALJIC No. 9.62.4 ["*If* you find a defendant guilty of a violation of Penal Code section 236.1, subdivision (c)(1) in Count 1 and/or Count 4, you must determine whether that offense involved" force, fear, or the like. (Italics added.)]. Cf. CALCRIM No. 3184 ["*If* you find the defendant

13

guilty of the crime[s] charged . . . *you must then decide* whether[, for each crime,] the People have proved the additional allegation that when the defendant committed (that/those) crime[s], (he/she) used [force or fear or the like]." (Italics added.)].) In other words, the jury had to determine if each defendant committed the crime with the requisite specific intent *before* deciding the "force or fear" sentencing factor.

Does Clark mean to argue the jury should have been instructed that the People had to prove he caused the victims to engage in commercial sex acts with the specific intent to pimp them, and *then also* to prove he used force, fear, or the like with the (same) specific intent to pimp the victims? But, again: when reaching and deciding the "force or fear" allegation, the jury already would have determined Clark acted with the requisite specific intent.

To the extent Clark contends a sentencing factor or enhancement must require specific intent when the underlying crime to which the allegation is attached requires specific intent, he is mistaken. For example, a defendant may be charged with robbery or criminal threats—both specific intent crimes (see CALCRIM Nos. 1600, 1300)—and with an allegation that he or she used or discharged a firearm, or inflicted great bodily injury, in the commission of the crime. Firearm allegations are general intent enhancements. (See *People v. Wardell* (2008) 162 Cal.App.4th 1484, 1493-1495 [firearm enhancements alleged for both robbery—a specific intent crime—and felony false imprisonment—a general intent crime].) The personal infliction of great body injury is as well (*People v. Carter* (1998) 60 Cal.App.4th 752, 755-756), and it may be alleged in connection with a specific intent offense. (See, e.g., *People v. Wallace* (1993) 14 Cal.App.4th 651, 663-665 [defendant convicted of both general and specific intent crimes]; cf. *People v Brown* (1985)

14

174 Cal.App.3d 762, 766-767 [great bodily injury enhancement in rape case does not require specific intent].)

Clark concedes there's no case recognizing the rule he urges us to adopt. Clark cites *People v. Carrasco* (2006) 137 Cal.App.4th 1050 (*Carrasco*). He misreads that case.

A jury convicted Carrasco of three robberies and found true allegations that he personally used and discharged a firearm in the commission of the crimes. Carrasco had come to a store where his former friend Dorado worked and demanded money. Dorado refused, and Carrasco left, but returned about an hour later, raising his hand in the shape of a gun outside the store. Carrasco then argued with a driver in the street outside and fired two shots toward the car as the driver left the parking lot. About 30 minutes later, Carrasco called Dorado and told him he was nearby and the bullet was meant for him. Two hours later, Carrasco returned and demanded Dorado give him money for beer. Dorado gave Carrasco $5. (*Carrasco, supra*, 137 Cal.App.4th at pp. 1054-1055.)

On appeal, Carrasco contended he hadn't fired the gun "during the commission" of the robbery. (*Carrasco, supra*, 137 Cal.App.4th at pp. 1053, 1059.) The court rejected this contention, stating that when a defendant " ' "deliberately shows a gun" ' " and there's no evidence of " ' "any purpose other than intimidating the victim," ' " " ' "the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." ' " (*Id*. at p. 1059.) The appellate court also rejected Carrasco's argument that the trial court should've instructed the jury that the firearm enhancement required the same "concurrence of act" and specific intent as did the robbery. (*Id*. at pp. 1060-1061.) In short, *Carrasco* supports the prosecution's position, not Clark's.

The statutory language here does not say the defendant must have intended to traffick the minor using force or fear. Rather, it prescribes a life sentence if the "*offense involve[d]* force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury." (§ 236.1(c)(2), italics added.) "The specific intent requirement [of trafficking a minor for sex] is entirely separate from the [requirement that the offense involved force, fear, or the like]." (See *People v. Jones* (1997) 58 Cal.App.4th 693, 717 [one strike sentencing factor that defendant used force or fear to move victim a substantial distance and that the movement substantially increased the risk of harm to victim did not require specific intent; "The specific intent requirement is entirely separate from the 'risk of harm' requirement."; "We see no reason to drag the specific intent requirement along with it."].)[9]

---

[9] The Attorney General contends subdivision (c)(2) of section 236.1 "is not an enhancement, but an alternate penalty provision." The CALCRIM equivalent of CALJIC No. 9.62.4 is CALCRIM No. 3184. That instruction is entitled, "Sex Offenses: Sentencing Factors—Using Force or Fear to Cause Minor to Engage in Commercial Sex Act." (CALCRIM No. 3184.) An enhancement is "an additional term of imprisonment added to the base term." (Cal. Rules of Court, rule 4.405(3).) An enhancement doesn't define a crime but instead imposes an added penalty when the crime is committed under specified circumstances. (See, e.g., *People v. Superior Court (Grilli)* (1978) 84 Cal.App.3d 506, 512.) As a leading treatise notes, it may be difficult to determine "whether a particular statute defines a crime, specifies the term of imprisonment for a crime, or creates an enhancement, and the case law is sometimes confusing." (3 Witkin & Epstein, Cal. Criminal Law (4th ed. 2021) Punishment, § 344, p. 526. See, e.g., *People v. Bright* (1996) 12 Cal.4th 652, 665 [section 664, subdivision (a), prescribing life term for willful, deliberate, premeditated murder, defines

Finally, any instructional error on this point was harmless in any event. (*People v. Watson* (1956) 46 Cal.2d 818.) There was no evidence that Clark beat or threatened Wendy and Lauren for any reason other than to compel them to continue to work for him and to give him the money they made as sex workers. Clark stomped and kicked Wendy when she hid her $40 tip; he called her names; and he beat her until she was "dripping blood" when she refused to return to work for him and Richmond. Similarly, Clark punched Lauren "over money." It is not reasonably probable the jury would have reached a result more favorable to Clark had the court instructed the jury that the sentencing factor required specific intent. (See *People v. Guyton* (2018) 20 Cal.App.5th 499, 508 (*Guyton*).)

## 2.      *Substantial evidence supports the jury's verdicts that Richmond aided and abetted violations of section 236.1(c)(2) as to victims Wendy S. and Lauren R.*

Richmond contends her conviction on counts 1 and 4 for trafficking of a minor involving force, fear, fraud, deceit, coercion,

---

enhancement, not separate crime]; *People v. Best* (1983) 143 Cal.App.3d 232, 235 [section 264.1, specifying punishment for rape in concert, defines separate crime and is not enhancement].)

For our purposes, it doesn't matter whether the "force, fear" sentencing factor is an enhancement, a special allegation, or something that renders a violation of section 236.1(c)(1) the entirely separate crime of a violation of section 236.1(c)(2), "aggravated human trafficking." (See, e.g., *People v. Jacobo* (2019) 37 Cal.App.5th 32, 37, 40-42.) As a true finding on that sentencing factor increases a defendant's punishment, the jury of course must find the prosecution has proved it beyond a reasonable doubt. (*Apprendi v. New Jersey* (2000) 530 U.S. 466.) The jury so found in this case.

violence, duress, menace, or threat of unlawful injury must be reversed or, in the alternative, the "force or fear" allegation stricken.[10] She asserts she was "tried . . . solely as a direct perpetrator as to" the "force or fear" allegation, and there was no evidence she personally used force or violence against the victims. In the alternative, Richmond argues the accomplice liability instruction applied only to the "crime" and not to the "force or fear" allegation. We are not persuaded.

As we have said, the court instructed the jury on the elements of trafficking a minor with CALJIC No. 9.62.3, which included the requirement of specific intent. The court also instructed the jury on aiding and abetting, using CALJIC Nos. 3.00, 3.01, 3.03, and 3.14. CALJIC No. 3.01 set forth the requisite specific intent as well as the requirement of knowledge. CALJIC No. 3.14 told the jurors that "[m]erely . . . assisting" or aiding without the required knowledge, intent, or purpose did not make one an accomplice.

Richmond cites no case that holds a jury must be separately instructed on aiding and abetting a sentencing factor or enhancement. (Cf. *Carrasco*, *supra*, 137 Cal.App.4th at pp. 1060-1061 [rejecting contention that court should have modified jury instruction on robbery by inserting "allegations" after the word "crimes"].) Counts 1 and 4 charged Richmond (and Clark) with violating section 236.1(c)(2), trafficking a minor for

---

[10] It is unclear if Clark purports to join in this argument. In his opening brief, he says he "joins in any arguments advanced by co-defendant Richmond that may accrue to his benefit." As the Attorney General notes, Clark offers no "argument [on this issue] specific to his own circumstances." In any event, any such contention by Clark is without merit, as there was ample evidence that he used force, fear, coercion, violence, and menace in his dealings with victims Wendy S. and Lauren R.

commercial sex by force or fear. The jury found Richmond guilty on those counts, and substantial evidence supports those verdicts. While Clark was the one who actually beat the girls, Richmond directly aided and abetted him in the crimes by placing Backpage ads, taking calls from tricks, arranging dates, and collecting money from the victims. She drove Lauren to out-calls and rented a room at the E-Z8 in Lancaster for her to perform services. She stood by while Clark threw Wendy off a bed, then kicked and stomped her as she lay on the floor. Lauren believed she couldn't say no to Richmond because she and Clark were "a team." "She was like the shot caller." "[I]t seemed like she was . . . the one in control." Even after Wendy left, Richmond was the one who contacted her and then drove her to a McDonald's where Clark got into the car, then later beat and robbed her, leaving her "dripping blood." A year later, Richmond was still contacting Wendy about coming back to work for her and Clark.

Richmond also contends she never beat the victims but "was instead beaten herself." Wendy testified she had seen Clark "assault" and "beat up" Richmond. "[A] couple of times," Wendy saw Clark "dragging [Richmond] by her hair."

But Richmond chose not to testify. She never said Clark forced her to do anything. Her counsel never asked the court to instruct on a defense of duress (see CALCRIM No. 3402) nor, in any event, was there any evidence that, if she had not participated fully in the recruitment and management of the victims, her "life would [have been] in immediate danger." (CALCRIM No. 3402.)

In closing argument, Richmond's counsel suggested Clark was "actually running the show" but he conceded Richmond "was like the right-hand man [sic]." Counsel acknowledged Richmond and Clark had children together, and Richmond "operate[d] in

19

sort of a managerial capacity." But, he argued, Clark "kept the money in the end." Counsel referred to Wendy's testimony—though noting "her credibility ha[d] been serious[ly] called into question"—and proposed "[m]aybe [Richmond] . . . was battered into low self-esteem."

Low self-esteem does not constitute duress. Having examined the entire record in the light most favorable to the judgment of conviction, as we must (*Guyton*, *supra*, 20 Cal.App.5th at p. 506), we are satisfied substantial evidence supports the jury's true finding on the sentencing factor for Richmond.

**3.** ***Substantial evidence supports defendants' convictions on count 5***

Both Clark and Richmond contend there was not substantial evidence that they deprived Faythe S. of, or violated, her personal liberty, as required for a violation of section 236.1, subdivision (a).

The principles governing our assessment of a defendant's challenge to the sufficiency of the evidence are well settled. We must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. (*Guyton, supra,* 20 Cal.App.5th at p. 506.) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also be reconciled with a contrary finding. A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. (*People v. Wyatt* (2010) 48 Cal.4th 776, 781;

20

*Oliver*, *supra*, 54 Cal.App.5th at p. 1099.)  Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.  (*Brooks*, at p. 57; *Oliver*, at p. 1099.)

Clark asserts "there was virtually no evidence that Faythe was ever compelled to work as a prostitute or that her personal liberty was in any way compromised through any coercive actions on either [Clark's] or Richmond's part."  Similarly, Richmond argues, "Faythe was already a sex worker when she met Clark, and agreed of her own free will to work for him."  Richmond says Faythe "was free to come and go whenever she pleased," and she "had access to Clark's car if she ever wanted to go somewhere."

While Faythe had "had sex for money" before she met Clark when she was 18, section 236.1(a) does not require that the defendant be the first to persuade a victim to become a commercial sex worker.  The crime is committed when the defendant "deprives or violates the personal liberty of another with the intent to obtain forced labor or services."  (§ 236.1, subd. (a).)  The statute provides, " 'Deprivation or violation of the personal liberty of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim . . . , under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out."  (§ 236.1, subd. (h)(3).)

The use of the word "includes" suggests other means— in addition to those listed—can satisfy the statute.  (See *Oliver*, *supra*, 54 Cal.App.5th at pp. 1096-1097.)  "[T]he Legislature adopted a broader definition of deprivation of personal liberty for purposes of human trafficking" than that for false imprisonment.  (*Id*. at p. 1096.)  Human trafficking does not require that the deprivation of personal liberty—the confinement or restraint—is

21

itself unlawful.  "Instead, confinement or restraint is punishable . . . if it is done with 'the intent to effect or maintain' a separate enumerated offense such as pimping and prostitution."  (*Ibid.*)

When walking the blade, Faythe had seven or "maybe more" "dates" a night.  At the E-Z8—where Richmond rented a room for her—she had 14 or more "dates" in a 24-hour period (some for cash and some for bitcoin).  Faythe gave Clark and Richmond all the money she made; she never kept any for herself.

If Faythe "finished all the condoms" Richmond had given her, she might be able to stop for the night.  But other times Clark told her she had to keep working.  Clark made her work even after she was raped.  She didn't feel she could say no; a "very angry" Clark would yell and "curse [her] out."  She feared Clark would get violent.  Clark gave Faythe methamphetamine so she could stay up.

While Faythe testified Clark had never hit her, Wendy testified about a time Faythe "didn't want to work no more, and she was tired."  "[S]he didn't want to work, or . . . she wanted something."  Clark "got mad that he had to buy her something, or that she had to go to sleep."  "He took her to the car."  When Faythe returned, she had injuries that gave Wendy reason to believe she'd been beaten up.

While the evidence at trial, taken as a whole, might "reasonably be reconciled" with a not guilty finding, it is sufficient to support the guilty verdicts on count 5.  (*See Oliver*, *supra*, 54 Cal.App.5th at pp. 1098-1101 [finding substantial evidence to support conviction for human trafficking even though victim "was free to go when she pleased"; defendant used verbal abuse to gain victim's compliance and "required [her] to work as a prostitute every day and to give [him] all the money she earned"]; *Guyton, supra,* 20 Cal.App.5th at pp. 503, 506-507

[human trafficking conviction affirmed; even though adult victim had her own hotel room, bought her own food, and had a cell phone, defendant gave her a daily quota, called her names when she didn't follow the rules, made her work when she was exhausted, and took all the money she made].)

## DISPOSITION

We affirm the judgments.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



LAVIN, Acting P. J.



WINDHAM, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.